# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

LAWRENCE WALEWSKI, individually and on behalf
of all others similarly situated,

              *Plaintiff*,

v.

ZENIMAX MEDIA, INC., a Delaware Corporation,
and BETHESDA SOFTWORKS, LLC, a Delaware
Limited Liability Company,

              *Defendants*,

_____/

Case No.

CLASS ACTION COMPLAINT
AND JURY DEMAND

### CLASS ACTION COMPLAINT

Plaintiff Lawrence Walewski, on behalf of himself and others similarly situated, brings

this class action complaint against Defendants ZeniMax Media, Inc. ("ZeniMax") and Bethesda

Softworks, LLC ("Bethesda," collectively with ZeniMax, "Defendants") based on Defendants'

deceptive and unlawful conduct in designing, manufacturing, marketing, distributing and selling

a defectively designed video game to consumers throughout the nation. Plaintiff, for his Class

Action Complaint, alleges as follows upon personal knowledge as to himself and his own acts

and experiences and, as to all other matters, upon information and belief, including investigation

conducted by his own attorneys.

### PARTIES

1.      Plaintiff Lawrence Walewski is a natural person and a citizen of the State of

Florida.

2.      Defendant ZeniMax Media, Inc. is a corporation incorporated and existing under the laws of the State of Delaware with its principal place of business located in Rockville, Maryland.

3.      Defendant Bethesda Softworks LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Rockville, Maryland.  Defendant transacts business in Florida and throughout the country. Bethesda is a wholly owned subsidiary of Defendant ZeniMax.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from any Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to the instant action.

5.      Venue is proper in this district under 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## CONDUCT COMPLAINED OF

### The *Elder Scrolls* Franchise

6.      Bethesda is an American video game developer and publisher.  Bethesda has developed a broad range of games, including The *Elder Scrolls* franchise, a single-player role playing video game series.

7.      Games within the *Elder Scrolls* series are available on multiple gaming platforms, including the Xbox 360 and PlayStation 3 consoles, as well as Windows-based personal computers.  In an *Elder Scrolls* game, a player typically controls and develops a single in-game

2

character (often referred to as an "avatar") through a series of "quests" in a fantasy gaming world.

8.     *The Elder Scrolls IV: Oblivion* is the fourth full installment of the *Elder Scrolls* series. Defendants originally released *Oblivion* on March 20, 2006 for Windows PCs and the Xbox 360 gaming console. Defendants released the game for the PlayStation 3 console on March 20, 2007.

9.     In Autumn, 2007, Defendants released *The Elder Scrolls IV: Oblivion Game of the Year Edition* for all three platforms. The *Game of the Year Edition* featured the original *Oblivion* video game, as well as two previously-released "expansion packs" that allegedly offered numerous hours of additional gameplay.

**Bethesda's Representations Regarding the Gameplay of *Elder Scrolls IV: Oblivion***

10.     The *Oblivion* video game purports to offer open-ended or "sandbox" gameplay, allowing players to freely roam the gaming world and perform various tasks, develop individual characters, or simply explore. While *Oblivion* features a linear main quest, Defendants encourage players to postpone or ignore the quest for as long as the player wishes to explore the entirety of the gaming world.

11.     At all relevant times, Defendants engaged in an extensive advertising and marketing campaign in support of the *Oblivion* video game. One of the primary features emphasized by Defendants in its advertisements was the longevity of the *Oblivion* video game and the sheer size of the virtual gaming world. Bethesda prominently advertised that the game offered an expansive, "free-form" world, with "open-ended" gameplay that allowed the player to explore with little limitation.

12.     For example, in an online description of the features of the game, Defendants

claimed that *Oblivion* offered:

> Open-ended game play and short challenges: The enormous world of
> *Oblivion* is open, allowing players to explore at their own pace.  Players
> will encounter shorter challenges such as fighting bandits, mixing potions,
> and creating magic along the way to unraveling the main quest.

13.     Similarly, the instruction manual for the *Oblivion Game of the Year Edition* for

the Xbox 360 states:

> With the Elder Scrolls, our goal has always been to create a game that
> offers unlimited possibilities.  A game where you could be whoever you
> wanted and to do whatever you wanted.  Live another life, in another
> world has been our motto, and we want you to do just that.
>
> So if you like wandering and exploring, that's what you should do.  If you
> simply want to complete the main quest and feel like you "finished" the
> game, then you can do just that.  Most folks will find themselves
> somewhere in between, and fortunately there's a lot of wandering and
> exploring involved in finishing the main quest.

14.     The terms "free-form," "open-ended," "open-world," and "sandbox" gameplay

have a distinct and tangible meaning in the video gaming community, including to Plaintiff and

members of the Class.  Gamers generally understand that such terms describe a game

environment that allows players to play creatively, free of artificial structural constraints, and

with there being "no right way" to play the game.  Because only a small number of games offer

this type of gameplay, many gamers are particularly attracted to true open-world, "sandbox"

games, and game developers such as Bethesda use these descriptors to induce gamers to

purchase their video games.

15.     In addition, character development is a primary element of the *Oblivion* video

game.  At the beginning of the game, the player selects a character from one of many different

"races" and customizes their character's appearance.  The player then creates one or more "save

4

files" that allow the user to save his or her character's progress throughout the game on their console's hard drive.

16.     One of the player's perpetual objectives in the game is to improve their character's skills, which are numerical representations of the character's ability in certain areas. The game rewards players with "perks" when their character reaches certain numerical levels in each skill.

17.     Because a player can best develop his or her character by performing tasks and missions outside of *Oblivion's* main quest, the focus on character development encourages players to spend substantial amounts of time exploring the gaming world to improve their character's skill levels.

18.     Defendants encourage consumers to spend substantial amounts of time developing individual characters. Indeed, on its official blog, Bethesda sponsored an "Oblivion Iron Man" contest that offered a prize to the player with the longest single-character gameplay time, which Defendant presumed would exceed 1000 hours.

19.     As a result of Defendants' advertisements and marketing efforts, consumers purchased the *Oblivion* video game with the expectation that it would offer expansive, open-ended gameplay with "unlimited opportunities" for exploration and character development.


**The Animation Defect**

20.     Contrary to the representations and advertisements of Defendants, the length, scope, and functionality of the *Oblivion* video game is severely limited by an inherent design defect that, to the player, unexpectedly occurs during gameplay and effectively shuts down a player's existing game once manifested. Despite its knowledge of the problem, Defendants have

taken no actions to correct the defect for existing players, and continue to sell the *Oblivion* video game without notifying future purchasers of the defects inherent in the game.

21.     Soon after its initial release, consumers began to experience and contact Defendants about major technical issues affecting the performance of the *Oblivion* video game. These "glitches" ranged in severity, from general slowing of gameplay, to screen "freezes" that forced players to reset their consoles or computers, to more serious problems that permanently shut down the game and prevented players from progressing further.

22.     Most seriously, the game suffers from a universal animation defect (the "Animation Defect") – commonly referred to in the gaming community as the "abomb" or "a-bomb" – that, once manifested, effectively ends the player's game and forces him or her to restart *Oblivion* from scratch with an entirely new character.  The Animation Defect occurs suddenly, without warning, sometimes after as little as 200 hours of gameplay.

23.     The Animation Defect causes all "secondary" animations to freeze, including spell effects, doorways, gateways, bridges, and traps, among other things.  While the lack of animation in these elements may seem purely aesthetic, the actual result is crippling to a player's quest, general gameplay, and overall use of the game.

24.     As a result of the Animation Defect, players are unable to open doors or gates, drop bridges, move elevators, or perform basic character animations that are essential to progressing in the game.  Because nearly every "quest" – including *Oblivion's* main quest – requires that the player open doorways, gates, and effectively cast spells, the player cannot progress in the game following the onset of the Animation Defect.  Accordingly, the player's only option is to restart the game with an entirely new character.

25.     The Animation Defect is particularly damaging to *Oblivion* game players because it often manifests after players have invested significant amounts of time and effort building their personal characters, a primary goal in the *Oblivion* video game.

26.     Every version of the *Oblivion* video game suffers from the Animation Defect.  For the vast majority of consumers, including all users of the *Oblivion* video game for the Xbox 360 and PlayStation 3 consoles, there is no remedy for the defect for any version of the *Oblivion* video game.

27.     Several *Oblivion* game players have identified the suspected cause of the Animation Defect on Bethesda's official forums.  Based on these consumer investigations, it is commonly understood that each *Oblivion* "save file" contains a four byte number sequence that continuously increases during gameplay.  When the number reaches a certain value, the Animation Defect is suddenly triggered, and values beyond the trigger value increase the severity of the defect.

28.     Said differently, as a user continues to play the *Oblivion* video game, each animation that occurs in the game adds to an internal "counter."  When the counter reaches its maximum level – an inevitable occurrence with continued gameplay – the Animation Defect suddenly occurs and the user's game is effectively ended.

29.     Players are thus forced to play *Oblivion* "under the gun" – they must rush to finish the game's main quest before the Animation Defect occurs, a far cry from the open-ended gameplay, "enormous world," and "unlimited possibilities" promised by Defendants.

30.     Defendants have offered no way to fix the Animation Defect on any version of the *Oblivion* video game without forfeiting all progress in the game. Once the Animation Defect has occurred, the *Oblivion* game will not function properly, and the player is forced to begin a new

game from scratch. Even then, the Animation Defect will inevitably reoccur after the player

creates and develops a new character and quest.

31.     Defendants have long been aware of the Animation Defect and its crippling effect

on gameplay. Despite its knowledge of the defect, Defendants have refused to provide a patch,

replacement product, or any other remedy.

32.     For example, in or about March, 2007, a Bethesda employee posted the following

comment on Bethesda's official forums in response to consumer complaints about the Animation

Defect:

> So here's the deal
> Our team is well aware of this issue, but it is one we have not been able to
> resolve because of the nature of the problem and any fixes related to it.
> We are continuing to look into it and will let folks know if/when we are
> able to address it in the future.

33.     Soon thereafter, a member of Bethesda's technical support staff provided the

following response to a consumer's question about the Animation Defect, which was then posted

on Bethesda's official forum:

> Hello,
>
> This issue will not be fixed.
> There is no official patch or fix to correct this issue from within the game.
> We are aware of the issue, but it is one we have not been able to resolve
> because of the nature of the problem and any fixes related to it. We are
> continuing to look into it and will let folks know if/when we are able to
> address it in the future.
> . . .
>
> Best Regards,
> James H. at Bethesda Softworks Technical Support
> Support04@bethsoft.com

34.     While Defendants admitted their knowledge of the Animation Defect on Bethesda's forums in response to complaints from current *Oblivion* players, Defendants intentionally did not further publicize or otherwise disclose the existence of the defect to a wider audience.  Accordingly, consumers were not made aware of the Animation Defect prior to purchasing the *Oblivion* video game.

35.     Defendants have not remedied the Animation Defect for any purchaser of the *Oblivion* video game.  Nor have Defendants undertaken any actions to notify past or future purchasers of the inherent defects in the *Oblivion* game.  Rather, consumers are led to believe that they *Oblivion* will experience expansive, unlimited gameplay, only to unexpectedly experience the Animation Defect after developing a unique character and quest.

36.     Defendants have continued to release new versions of *Oblivion* with full knowledge of – and without fixing – the Animation Defect, including *Oblivion: Game of the Year Edition* and the recently released *Oblivion: 5th Anniversary Edition*, which Defendants released on July 12, 2011.

37.     Defendants continue to market the longevity and "free-form" nature of the *Oblivion* video game despite their knowledge of the Animation Defect, an inherent defect that Defendants know will shut down the game after only moderate levels of gameplay.

**Damages Suffered by Purchasers of the *Oblivion* Video Game**

38.     The existence of the Animation Defect significantly decreases the value of the *Oblivion* video game to consumers.  As described above, games that provide true open-ended, expansive gameplay are highly valued by gamers and are worth more to consumers than games limited by inherent gameplay defects.

39.     Based on Defendants' advertisements and representations, consumers purchased the *Oblivion* video game with the expectation that it would offer open-ended, free form, expansive gameplay that could be experienced at the player's own pace. However, the Animation Defect severely limits *Oblivion's* gameplay after moderate use, resulting in consumers receiving a less valuable product than they initially paid for and expected. Had consumers known of the inherent defects in the *Oblivion* video game prior to purchase, they would not have purchased *Oblivion* or would have paid less money to purchase the game.

40.     Consumers are further harmed because the Animation Defect diminishes the resale value of the *Oblivion* video game on the secondary market. Traditionally, the secondary market for video game sales is strong, allowing consumers to sell used video games to traditional retailers and directly to other consumers through online transactions. However, the existence of the Animation Defect makes it more difficult to resell the *Oblivion* video game, and potentially exposes the seller to liability to other consumers if the seller does not disclose the Animation Defect prior to resale. Sellers are thus left with the unenviable choice of similarly deceiving buyers and promoting the *Oblivion* video game like Defendants, or disclosing the Animation Defect and suffering from the resulting decrease in value on the secondary market.

### FACTS RELATING TO PLAINTIFF WALEWSKI

41.     Plaintiff Lawrence Walewski purchased *Oblivion: Game of the Year Edition* for the Xbox 360 video game console in or around March, 2011.

42.     Prior to purchasing the *Oblivion* video game, Plaintiff viewed Defendants' advertisements and representations regarding the scope and longevity of the gameplay purportedly featured in the *Oblivion* video game. The gameplay of *Oblivion* was the primary reason that Plaintiff purchased the game.

43.     Prior to purchasing *Oblivion*, Plaintiff was not aware that every copy of the *Oblivion* video game, including *Oblivion: Game of the Year Edition*, suffered from the Animation Defect, and Plaintiff had no reason to know that each copy of the *Oblivion* video game suffered from the Animation Defect as a result of Defendants' misrepresentations and omissions.

44.     Had Plaintiff known about the Animation Defect and its effect on *Oblivion's* gameplay, he would not have purchased the *Oblivion* video game, would have paid less money for the game, or would have attempted to return or exchange the game within the appropriate time period.

45.     Plaintiff began playing his copy of *Oblivion: Game of the Year Edition* in or around March, 2011. As encouraged by Defendants, Plaintiff created and began to develop a unique character within the game.

46.     Plaintiff experienced numerous technical problems while playing the *Oblivion* video game. Among other things, Plaintiff's game continuously "froze" after short periods of gameplay, forcing Plaintiff to restart his Xbox 360 console and forfeit progress in the game.

47.     After approximately 450 hours of gameplay, the Animation Defect suddenly manifested in Plaintiff's copy of the *Oblivion* video game. Plaintiff was unable to open doors and gates, cast spells, or trigger numerous other animations that were essential to the completion of *Oblivion's* main quest and numerous side quests.

48.     Plaintiff restarted his Xbox 360 console and attempted to reload his saved game. Plaintiff discovered that the Animation Defect was still present and continued to prevent further progress in the game.

11

49.     As a result of the Animation Defect, Plaintiff was forced to abandon his saved game and forfeit his original character and progress in the game.  Plaintiff was unable to recover any data relating to his initial *Oblivion* save file.

50.     Because Plaintiff is now aware of the existence of the Animation Defect and the fact that it will suddenly occur and ruin any subsequent character and saved game file that Plaintiff creates, Plaintiff no longer plays the *Oblivion* video game solely because of the Animation Defect.

## CLASS ALLEGATIONS

51.     Plaintiff Lawrence Walewski brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons or entities residing in the United States who purchased any version of the *Elder Scrolls IV: Oblivion* video game.

Excluded from the Class are 1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, 2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, 3) persons who execute and file a timely request for exclusion, and 4) the legal representatives, successors, or assigns of any such excluded person.

52.     Upon information and belief, the Class consists of millions of members such that joinder of all members is impracticable.

53.     Plaintiff's claims are typical of the claims of all of the other members of the class. Plaintiff and each Class member were affected in substantially the same way by Defendants' fraudulent, misleading, and unlawful marketing and shipment of a defective product.

54.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class.

55.     The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Class are the same, resulting in injury to Plaintiffs and all of the other members of the Class. Plaintiffs and the other members of the Class have all suffered harm and damages as a result of Defendants' wrongful conduct.

56.     Common questions of law and fact exist as to all members of the Class and such questions predominate over any questions affecting Plaintiff or individual members. Common questions for the Class include but are not limited to:

(a)     whether the *Oblivion* video game fails to conform to Defendants' advertised product specifications;

(b)     whether Defendants made false or misleading statements about the scope or capabilities of the *Oblivion* video game;

(c)     whether Defendants knowingly concealed the defective design of the *Oblivion* video game;

(d)     whether Defendants refused to remedy or patch the Animation Defect;

(e)     whether the Animation Defect led to a diminution in the value of the *Oblivion* video game;

    (f)      whether Defendants made representations that the *Oblivion* video game

was of a particular standard or quality, which it was not;

    (g)      whether Defendants made representations that the *Oblivion* video game

had characteristics, uses, benefits, or qualities which it did not have;

    (h)      whether Defendants' conduct as described herein violated the Maryland

Deceptive Practices Act, Md. Code Ann., Comm. Law § 13-101, *et seq.*;

    (i)      whether Defendants' conduct described herein constituted false

advertising under Md. Code Ann., Comm. Law § 11-701; and

    (j)      whether Defendants' conduct described herein resulted in unjust

enrichment to Defendant.

57.      Plaintiff will fairly and adequately protect the interests of the other members of

the Class, his claims are typical of the other members of the Class, and he has retained counsel

competent and experienced in similar class action litigation. Neither Plaintiff nor his counsel

have any interest adverse to those of the other members of the Class.

58.      Absent a class action, most members of the Class would find the cost of litigating

their claims to be prohibitive and will have no effective remedy. The class treatment of common

questions of law and fact is also superior to multiple individual actions or piecemeal litigation in

that it conserves the resources of the courts and litigants, and promotes consistency and

efficiency of adjudication.

**COUNT I**
**Violation of the Maryland Deceptive Practices Act;**
**Md. Code Ann., Comm. Law § 13-101 *et seq.***
**(On behalf of Plaintiff and the Class)**

14

59.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein

60.     Maryland's Consumer Protection Act ("CPA"), Md. Code Ann., Comm. Law § 13-101 *et seq.*, prohibits any "person" from engaging in any unfair or deceptive trade practices, *inter alia*, in connection with the sale of consumer goods or services.

61.     As "persons" under CPA § 13-101(h), Defendants are prohibited from engaging in unfair and deceptive trade practices.

62.     The CPA specifically prohibits Defendants from making any false or misleading oral or written statement or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers.  CPA § 13-301(1).

63.     The CPA further prohibits Defendants from failing to state a material fact if the failure deceives or tends to deceive.  CPA § 13-301(3).

64.     By representing that the *Oblivion* video game offered open-ended gameplay, unlimited opportunities, and gameplay that can be experienced at the player's own pace, and by failing to disclose the existence of the Animation Defect and its effect on gameplay, Defendants have violated the CPA in at least the following respects:

      a.     In violation of section 13-301(1), Defendants have made false and misleading statements which have the capacity, tendency or effect of deceiving or misleading consumers;

      b.     In violation of section 13-301(2)(i), Defendants have represented that the *Oblivion* video game has an accessory, characteristic, ingredient, use, benefit, or quantity which it does not have;

c.   In violation of section 13-301(2)(iv), Defendants have represented that the *Oblivion* video game is of a particular standard, quality, grade, style, or model which it is not;

d.   In violation of section 13-301(3), Defendants have failed to state a material fact that deceived or tends to deceive consumers; and

e.   In violation of section 13-301(9), Defendants have knowingly concealed, suppressed, or omitted a material fact with the intent that a consumer rely on the same in connection with the sale of consumer goods.

65.   Defendants concealed material facts regarding the *Oblivion* video game from Plaintiff and the members of the Class, including the fact that the Animation Defect prevented players from experiencing the expansive, open-ended, unlimited gameplay in accordance with Defendants' advertised performance specifications. This type of information is relied upon by consumers in making purchase decisions, and is material to the decision to purchase a costly video game. Had Defendants disclosed such information, it would have been made known to Plaintiff and members of the Class through the marketing and advertising presented to Plaintiff and members of the class by Defendants, and Plaintiff and the members of the Class would not have purchased the *Oblivion* video game, would have paid less money for the game, or would have attempted to return or exchange the game within the appropriate time period.

66.   As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff and members of the Class suffered damages in the form of monies paid to purchase the *Oblivion* video game, and/or the difference in value between an *Oblivion* video game with and without the Animation Defect.

67.     Plaintiff, on behalf of himself and each member of the Class, seeks damages, injunctive relief, and any other relief allowed under the CPA.

**COUNT II**
**False Advertising in Violation of the Maryland Consumer Protection Act**
**Md. Code Ann., Comm. Law § 11-701**
**(On behalf of Plaintiff and the Class)**

68.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

69.     Md. Code Ann., Comm. Law § 11-701 provides that "Advertise Falsely" "means to use any advertisement, including a label, which is misleading in a material respect." Section 11-703 provides that "[a] person may not advertise falsely in the conduct of any business, trade, or commerce or in the provision of any service."

70.     Defendants engaged in advertising and marketing to the public, and offered for sale the *Oblivion* video game on a nationwide basis. Defendants publicly represented and advertised that the *Oblivion* video game featured an expansive and "free form" world, offered "open-ended gameplay," provided "unlimited opportunities," and allowed players to "explore at their own pace." Defendants made these representations with the intent to induce Plaintiff and Class members to purchase the *Oblivion* video game.

71.     Defendants' advertising and marketing statements were and are untrue or misleading and likely to deceive the public in that the public statements portrayed a technical capability and characteristic that Defendants knew or should have known the *Oblivion* video game was unable to deliver, as was apparent when Defendants admitted that they could not or would not address the Animation Defect.

17

72.     In making and disseminating the statements alleged herein, Defendants knew or should have known that their statements were false and misleading and therefore in violation of § 11-701, *et seq.*

73.     As a direct and proximate result of Defendants' false advertising, Plaintiff and members of the Class suffered damages in the form of monies paid to purchase the *Oblivion* video game, and/or the difference in value between an *Oblivion* video game with and without the Animation Defect

74.     Plaintiff seeks and order enjoining Defendants from continuing to engage in the false advertising described herein.  Plaintiff seeks an order (1) requiring Defendants to cease the false advertising practices described herein; (2) requiring Defendants to restore to Class members any money acquired by means of false advertising (restitution); and, (3) awarding reasonable costs and attorneys' fees.

### Count III
### Breached of Implied Warranty of Merchantability
### (On behalf of Plaintiff and the Class)

75.     Plaintiff incorporates by reference paragraphs 1 through 55 above as if set forth fully herein.

76.     Under MD. Code § 2-314, a warranty of merchantability is implied in the sale of goods by a merchant who deals in goods of that kind.

77.     At the time Defendants designed, manufactured, and sold the *Oblivion* video game for use by Plaintiff and the Class, Defendants knew of the uses for which the *Oblivion* video game was intended, and impliedly warranted it would be of merchantable quality and fit for its intended use.

78.     Defendants' implied warranty included that the *Oblivion* video game would offer free-form, open-ended, expansive gameplay, and be free of inherent defects that prevented such gameplay.  In actuality, the *Oblivion* video game suffered from the Animation Defect, such that the *Oblivion* video game was not of merchantable quality or fit for its intended use.

79.     As a direct and proximate result of Defendants' misconduct, Plaintiff and the Class have suffered damages, including the loss of monies paid to purchase the *Oblivion* video game, and/or the difference in value between an *Oblivion* video game with and without the Animation Defect.

**COUNT IV**
**Restitution/Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

80.     Plaintiff incorporates by reference paragraphs 1 through 55 above as if set forth fully herein.

81.     Plaintiff and the Class have conferred a benefit upon Defendants.  Defendants have received and retained money belonging to Plaintiff and the Class as a result of its unlawful and deceptive practices.

82.     Defendants appreciate or have knowledge of said benefit.

83.     Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and the Class that it unjustly received as a result of its actions.

84.     Plaintiff and the Class have suffered financial loss as a direct result of Defendants' conduct.

85.     Plaintiff, on his own behalf and on behalf of the Class, seeks the imposition of a

constructive trust on and restitution of the proceeds Defendants received as a result of its conduct

described herein, as well as attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lawrence Walewski, individually and on behalf of the Class,

prays for the following relief:

1.   An order certifying this case as a class action on behalf of the Class

defined above, appointing Lawrence Walewski as the representative of the

Class, and appointing his counsel as class counsel;

2.   An entry of judgment against Defendants ZeniMax and Bethesda for all

monetary, actual, consequential, and compensatory damages caused by

their unlawful conduct;

3.   An injunction requiring Defendant to cease all fraudulent and misleading

advertising regarding the *Oblivion* video game, and otherwise protecting

the interests of the Class;

4.   Award Plaintiff and the Class restitution in the form of complete

disgorgement of all revenue derived from sales of the *Oblivion* video

game and each of its editions;

5.   An award of reasonable attorneys' fees and costs; and

6.   Such further and other relief the Court deems reasonable and just.

### JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated:  July 15, 2011

LAWRENCE WALEWSKI, individually and on behalf of all others similarly situated,

By: _Steven W. Teppler_

Steven W. Teppler
One of Mr. Walewski's Attorneys

Steven W. Teppler
Florida Bar Number 14787
steppler@edelson.com
EDELSON MCGUIRE LLC
5715 Firestone Court
Sarasota, FL 34238
Telephone: (941) 487-0050
Facsimile: (312) 572-7210

Jay Edelson
jedelson@edelson.com
Rafey Balabanian
rbalabanian@edelson.com
Bradley Baglien
bbaglien@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60604
Telephone: (312) 589-6370
Facsimile: (312) 589-6378